# CRIMINAL COMPLAINT

| United States District Court | DISTRICT of ARIZONA |
|---|---|
| United States of America<br>v.<br>**CARLOS CHAVEZ**<br>DOB: xx/xx/1986; Mexican Citizen<br>**JESUS CARILLO**<br>DOB: xx/xx/1991; United States Citizen<br>**Additional Defendants Listed on Reverse** | DOCKET NO.<br><br>FILED _____ LODGED<br>RECEIVED _____ COPY<br><br>JUN 3 2011<br><br>CLERK U S DISTRICT COURT<br>DISTRICT OF ARIZONA<br>BY_____ DEPUTY<br><br>MAGISTRATE'S CASE NO.<br>**11-03556M** |

Complaint for violations of Title 21, United States Code § 846; and Title 18, United States Code § 924(c).

**COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:**
See attached charges incorporated by reference herein.

**BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:**
See attached statement of probable cause incorporated by reference herein.

**MATERIAL WITNESSES IN RELATION TO THE CHARGE:**

| WARRANT AND DETENTION REQUESTED<br>Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge.<br>AUSA Angela W. Woolridge<br>*/s/ Angela W. Woolridge/*<br>Sworn to before me and subscribed in my presence. | SIGNATURE OF COMPLAINANT<br>(official title) */s/* |
|---|---|
| | OFFICIAL TITLE<br>**ATF Agent** |
| SIGNATURE OF MAGISTRATE JUDGE | DATE<br>June 3, 2011 |

**Additional Defendants as continued from front:**

**CESAR MORENO**
DOB: xx/xx/1985; United States Citizen
**OMAR LOPEZ-VANEGAS**
DOB: xx/xx/1976; Mexican Citizen
**JESUS NORIEGA**
DOB: xx/xx/1980; United States Citizen
**OMAR CASTRO-NIABLA**
DOB: xx/xx/1982; Mexican Citizen
**STEPHEN WIMBERLY**
DOB: xx/xx/1983; United States Citizen
**MIGUEL MENDOZA**
DOB: xx/xx/1986; United States Citizen
**RICARDO NORIEGA**
DOB: xx/xx/1983; United States Citizen
~~**MIGUEL MENDOZA**~~
DOB: xx/xx/19xx; United States Citizen
~~**RICARDO NORIEGA**~~
DOB: xx/xx/19xx; United States Citizen

**CARLOS CHAVEZ**
DOB: xx/xx/1986; Mexican Citizen
**JESUS CARILLO**
DOB: xx/xx/1991; United States Citizen
**CESAR MORENO**
DOB: xx/xx/1985; United States Citizen
**OMAR LOPEZ-VANEGAS**
DOB: xx/xx/1976; Mexican Citizen
**JESUS NORIEGA**
DOB: xx/xx/1980; United States Citizen
**OMAR CASTRO-NIABLA**
DOB: xx/xx/1982; Mexican Citizen
**STEPHEN WIMBERLY**
DOB: xx/xx/1983; United States Citizen
~~**MIGUEL MENDOZA**~~
~~DOB: xx/xx/1986;~~ United States Citizen
~~**RICARDO NORIEGA**~~
~~DOB: xx/xx/1983;~~ United States Citizen

11-03556M-

**Count One**

From on or about April of 2011 and up to and including June 2, 2011, at or near Tucson, in the District of Arizona, **CARLOS CHAVEZ, JESUS CARILLO, CESAR MORENO, OMAR LOPEZ-VANEGAS, JESUS NORIEGA, OMAR CASTRO-NIABLA, STEPHEN WIMBERLY, MIGUEL MENDOZA,** and **RICARDO NORIEGA**, named herein as defendants and co-conspirators, did knowingly and intentionally combine, conspire, confederate and agree together and with other persons to possess with intent to distribute 100 kilograms or more of marijuana, but less than 1,000 kilograms of marijuana, that is, approximately 682 kilograms of marijuana, a Schedule I controlled substance; in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(vii).

All in violation of Title 21, United States Code, Section 846.

**Count Two**

On or about June 2, 2011, at or near Tucson, in the District of Arizona, **CARLOS CHAVEZ, JESUS CARILLO, CESAR MORENO, OMAR LOPEZ-VANEGAS, JESUS NORIEGA, OMAR CASTRO-NIABLA, STEPHEN WIMBERLY, MIGUEL MENDOZA,** and **RICARDO NORIEGA**, did possess and carry a firearm; or aided, abetted, counseled, commanded, induced and procured the possession and carrying of a firearm; specifically, one Sig Sauer 9mm Luger pistol; in furtherance of a drug trafficking offense as defined in Title 18, United States Code, Section 924(c)(2) and Title 21, United States Code, Section 802, et. seq., that is, conspiracy to possess with intent to distribute a controlled substance, as alleged in Count One of this complaint; in violation of Title 18, United States Code, Sections 924(c) and 2.

**Basis for Complaint**

In November, 2010, at or near Tucson, in the District of Arizona, Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) special agents interviewed an ATF Confidential Informant (CI) and learned that Jesus Carlos CHAVEZ and another individual know only as Raul LNU where involved in home invasion robberies in Tucson. The CI arranged for undercover officers from the Tucson Police Department to meet with Raul LNU on November 12, 2010, and a home invasion scenario was presented to Raul LNU. After the initial meeting with Raul LNU, the undercover officers had no future contact and the investigation into the home invasion crew was put on hold. The undercover officers did not meet with CHAVEZ during this initial phase of the investigation.

In April of 2011, the CI again told ATF S/A's Kolar, Korn and Zayas that CHAVEZ had a home invasion crew and was actively looking for a marijuana drug stash house in Tucson. On April 18, 2010, the CI made telephonic contact with CHAVEZ and arranged for the CI and an undercover ATF special agent (UC) to meet with CHAVEZ to discuss a home invasion robbery. On the same date, at approximately 10:50 pm, the UC and CI arrived in the vicinity of First Avenue and Prince Road in an undercover vehicle. A short time later, CHAVEZ arrived driving a 2001 white Ford F-150 pickup truck. CHAVEZ entered the undercover vehicle. Subsequent to an initial greeting, the UC advised CHAVEZ of the seriousness surrounding their discussion. The UC stated that he is a disgruntled courier of 100 pounds of marijuana for a narcotics trafficking, and that he was due to collect the marijuana on Thursday or Friday. On that day, he would be contacted and told the exact location of the residence and provided ten to fifteen minutes to arrive. The UC explained that upon arriving at the residence, he observes two individuals in the residence, one of which is armed with a firearm. The UC also explained that while waiting to collect the marijuana, he observes an additional 1,000 to 1,500 pounds of marijuana in the residence. The UC clarified for CHAVEZ that the residence in question contained only marijuana. CHAVEZ questioned the UC concerning the two alleged occupants in the residence and the regularity of the UC's collections. CHAVEZ also questioned the UC if the alleged occupants utilized different residences. The UC stated that the proceeds of the robbery (the marijuana) would be divided evenly among all the participants. The UC advised that he was due to be contacted the following day and told the day of the collection, and requested to meet with CHAVEZ subsequent to obtaining this information. CHAVEZ replied, "I need to have the people armed". CHAVEZ further replied that he currently did not have the firearms needed. CHAVEZ stated that the firearms had been sold due to the fact that there were no robberies available. The UC advised CHAVEZ that if he (CHAVEZ) could not execute the robbery, he (the UC) would seek others. CHAVEZ responded ,"No, we are going to do it, but you have to wait a little while". The UC requested to meet with CHAVEZ, face to face, the following day. CHAVEZ stated that his crew would be paid with the proceeds of the robbery (marijuana). The UC and CHAVEZ agreed to meet the following day between the hours of 2:00 pm and 5:00 pm. CHAVEZ requested that the UC conduct the collection later this week and stated that the robbery would be executed at the following collection. The UC questioned CHAVEZ, "And these people, they know what they are doing?" CHAVEZ replied, "Yes, yes, yes, yes." The UC and CI then departed the meeting. CHAVEZ later contacted the CI on the telephone and told the CI that he was comfortable dealing with the UC.

On April 19, 2011, the UC and CI traveled to the same area (First Avenue and Prince Road) in the undercover vehicle to meet with CHAVEZ. Upon arriving, the CI received a phone call from CHAVEZ, who stated that he was in the parking lot waiting in his vehicle. CHAVEZ and Jesus CARILLO then approached the undercover vehicle and entered the rear of the vehicle to meet with the UC and CI. Chavez requested that the UC reiterate the details of the impending home invasion robbery, and questioned the UC about how long he had been collecting for the drug trafficking organization. CARILLO questioned the UC about whether the residences (where the collections occurred) were different. The UC explained that when he enters the residence he observes two individuals, one of whom is armed with a firearm. The UC advised that he collects 100 pounds and observes an additional marked 1,000 to 1,500 pounds. CHAVEZ and CARILLO continued to question the UC concerning the alleged residences. The UC confirmed with CHAVEZ and CARILLO that they were discussing marijuana. The UC stated that he was going to conduct the collection the following morning, April 20, 2011. The UC explained that he would be told to wait in a general area and would then be contacted and told the exact address and provided ten to fifteen minutes to arrive. CHAVEZ questioned the UC if additional individuals would be present. The UC replied that he only observed two individuals. CHAVEZ and CARILLO questioned the UC as to the manner in which the collections were conducted. CARILLO began to formulate a plan, stating he intended to place a portion of his crew in the UC's vehicle. CHAVEZ stated that they would have to use force on the individuals in the residence. The UC discussed splitting the proceeds of the robbery (marijuana) in half. CHAVEZ and CARILLO continued to discuss their plan and the use of multiple vehicles. CARILLO stated he believed that additional individuals would be present. The UC stated his next collection date would be at the beginning of June. CHAVEZ and CARILLO confirmed that they and their crew would be ready to conduct the robbery at that time. The UC discussed selling his portion of the marijuana subsequent to the robbery and dividing the proceeds. CHAVEZ discussed obtaining firearms for the robbery. CHAVEZ advised the UC, "Yes, it will be done". CHAVEZ requested that the UC observe details of the residence at the collection the following day. CHAVEZ confirmed that the robbery would be executed. CARILLO stated that he had the crew; however he needed firearms. CARILLO assured the UC that the robbery would be conducted correctly. The UC, CHAVEZ and CARILLO discussed whether the UC should remain at the residence or depart once the robbery had been completed. CHAVEZ discussed utilizing a firearm which did not make any noise. CARILLO stated they would tie up the occupants of the residence. CHAVEZ and CARILLO discussed the residence. CHAVEZ talked about the fact that previous stash houses had no furniture and that now these locations contained furniture. CHAVEZ again stated, "Yes, it will be done". CARILLO advised that he believed the occupants of the residence would be using radios to identify when the UC arrived and when he departed. CHAVEZ discussed the manner in which stash houses operate. CARILLO explained the role that each crew member would have during the robbery. CARILLO stated that on the day of the robbery they would be ready in the morning, at a nearby park. CARILLO further stated that they needed a large vehicle. The UC advised that he may be able to obtain such a vehicle. CHAVEZ again reiterated, "All is good, it will be done." The UC and CI then departed the area.

On April 21, 2011, the CI contacted CHAVEZ telephonically and advised CHAVEZ that the UC was near Alabama and that "all was good." The CI stated that the UC told him/her (the CI) that a week before the next collection he (the UC) would speak with him (CHAVEZ). CHAVEZ asked when the UC would be arriving. The CI answered that it would be at the beginning of June. CHAVEZ asked the

UC how many individuals would be present (in the stash house). The CI answered, "The same." CHAVEZ replied, "The two persons?" The CI responded, "Yes, the two." The CI asked CHAVEZ if everything was good with his people. CHAVEZ replied, "Yes." CHAVEZ stated that he and his associates were going to "make more plans."

On May 26, 2011, the UC and CI traveled to the location of the previous meetings (the area of First Avenue and Prince Road) and met with CHAVEZ and an unknown Hispanic male (later identified as Omar LOPEZ-VANEGAS). CHAVEZ and LOPEZ-VANEGAS entered the back of the undercover vehicle. The UC stated the last time he had conducted a collection, he observed two individuals, one of whom was armed with a firearm, and between 1,500 and 2,000 pounds (of marijuana). The UC stated the residence was near Interstate 19 and Valencia Road. The UC also advised that he was provided 100 pounds (of marijuana) to transport to Birmingham, Alabama. The UC stated that on Thursday the following week (June 2, 2011) he was due for another collection. CHAVEZ asked, "Another hundred?" The UC affirmed this amount and stated that on Wednesday (June 1, 2011) he would be told the exact time and general area of the collection. The UC requested to meet on June 1, 2011, subsequent to receiving the information. The UC questioned CHAVEZ and LOPEZ-VANEGAS if they could execute the robbery. LOPEZ-VANEGAS replied, "Yes, it will be done," stated that his nephew had been recently stopped in his vehicle with all the items, and advised that he had recently viewed other items that could be utilized. CHAVEZ requested that the UC fully explain the circumstances surrounding the impending robbery. The UC requested that on June 1, 2011, all parties involved meet and completely discuss the robbery. CHAVEZ questioned the UC concerning the residence and the manner in which he is provided the marijuana for distribution. The UC again explained the fact that an armed individual would be present in the residence and that he would be provided 100 pounds (of marijuana). The UC also explained that the 1,500 to 2,000 marked pounds were in the front portion of the interior of the residence. The UC stated that the packaging would have to be removed, and stated it's always "marijuana." LOPEZ-VANEGAS advised that the marijuana would have to be broken down. The UC advised that the division of the proceeds of the robbery (marijuana) would be "half and half." The UC and LOPEZ-VANEGAS engaged in conversation concerning dividing the proceeds. LOPEZ-VANEGAS indicated that the occupants of the residence would be killed. CHAVEZ stated that they may contact the UC prior to June 1, 2011, to meet. LOPEZ-VANEGAS stated that he would speak with the remainder of the crew and advise them of the information he had been provided, and that after speaking with them he may have to meet with the UC prior to June 1, 2011. The UC agreed to this arrangement. CHAVEZ and LOPEZ-VANEGAS exited the undercover vehicle, and the UC and CI departed the area.

On May 29, 2011, the UC received a telephone call from CHAVEZ. CHAVEZ requested to meet with the UC the following day. The UC advised that he could meet; however the meeting would have to take place in the late afternoon. CHAVEZ replied that he was busy during that time period, and advised that he would speak with his associates to determine if the meeting could be held at that time. Later the same date the UC received another telephone call from CHAVEZ. CHAVEZ requested to meet between 3:30 pm and 4:00 pm the following date. The UC advised that he would be unable to meet until late afternoon. The UC and CHAVEZ agreed to meet at 6:00 pm at the previous meeting location (the area of First Avenue and Prince Road) the following day. CHAVEZ stated it would be he and the unknown Hispanic male (observed on May 26, 2011) present at the

meeting. Later the same date, the UC discovered that he had missed a telephone call from the CHAVEZ's cellular number. The UC returned the call, at which time CHAVEZ advised that at the scheduled meeting, he and his associates wished to fully discuss the robbery at a nearby park. The UC agreed to this arrangement.

On May 30, 2011, the UC discovered that he had missed a telephone call from CHAVEZ's cellular number. The UC returned the call, at which time CHAVEZ confirmed the meeting with the UC at 6:00 pm that date at First Avenue and Prince Road. Later the same date, the UC and CI traveled to the meeting location and made telephonic contact with CHAVEZ. A short time later CHAVEZ arrived in a white pick-up truck, and the UC followed CHAVEZ's vehicle to a nearby park at the intersection of Prince Road and Fairview Avenue. At the park, CHAVEZ parked between a dark vehicle and a blue vehicle. As the UC approached CHAVEZ's vehicle, an unknown Hispanic male (later identified as Jesus NORIEGA) walked from a pavilion area to CHAVEZ's vehicle, two other unknown Hispanic males (one of whom was later identified as Cesar MORENO) exited the dark vehicle and walked to CHAVEZ's vehicle, and two additional Hispanic males (one of whom was LOPEZ-VANEGAS) also approached CHAVEZ's vehicle at the same time. After exchanging greetings, the UC determined that all the individuals, with the exception of CHAVEZ, spoke English. At the request of LOPEZ-VANEGAS, the UC initially stated, in Spanish, the circumstances surrounding the collection. The UC stated that on Wednesday, June 1, 2011, he would be told the area and time he would be contacted on Friday, June 3, 2011. The UC advised that on June 3, 2011 he would wait in the area provided for a telephone call. Upon receiving the telephone call and the exact location of the collection, he would be allotted ten to fifteen minutes to arrive. The UC requested to meet with the crew on Wednesday, June 1, 2011, subsequent to receiving the information. The UC stated that upon entering the residence he observes two individuals, one of whom is armed with a firearm. The UC further stated that the second individual travels to a rear bedroom, returns to the UC's location and provides him with 100 pounds of marijuana for distribution. The UC explained that he also observed between 1,500 to 2,000 marked pounds in the living room. The UC further explained that he was disgruntled with the organization due to not receiving sufficient funds for his efforts. The UC advised that the proceeds of the robbery (marijuana) would be divided evenly, with half to the UC and half to the crew. The Hispanic male standing immediately to the UC's right (later identified as Omar CASTRO) asked if the UC was sure of the amount would be present. The UC assured CASTRO of the amount. The UC turned to the Hispanic male immediately to his left (later identified as Stephen WIMBERLY) and stated in English "hey Bro, what I told him is that I pick up 100 pounds of pot and I got this house, there's two guys there, one guy's armed, with a gun, okay, whenever I go in there, they always give me 100." WIMBERLY questioned the UC as to the occupants, "the fat guy and the skinny guy." The UC replied, "The fat guy's got the gun, he stays with me, okay, the skinny dude goes around to a back room, gives me my 100 pounds and I split, but the thing is, while I'm standing there dude, I see like 1,500 pounds to 2,000 pounds of pot in the living room, but they're marked, so that means you guys have to take the packaging off." The UC confirmed with WIMBERLY that after the robbery the marijuana was going to be moved outside the Tucson area and that the crew would not have a problem distributing it. WIMBERLY questioned the UC as to the number of bedrooms in the residence. Jesus NORIEGA asked the UC, "Are you going in there with us?" The UC replied, "Whatever you guys tell me to do, I'll do." The UC requested to remain "tied up in the house." Jesus NORIEGA stated, "What I want to do is, uh, for you to drive in, load up and we'll just hit it right

there, boom." Jesus NORIEGA and WIMBERLY stated they would take "everything." The UC explained to all the individuals that the occupants were serious people. WIMBERLY stated that MORENO is the person who "ties them down." Jesus NORIEGA advised, "He's the one who's going to be tying you up," referring to MORENO. CASTRO asked, in Spanish, where they would meet after the robbery. The UC replied, in Spanish, that they could meet with the CI and provide him/her his (the UC's) portion of the marijuana. The UC asked LOPEZ-VANEGAS if they were going to have problems obtaining the items for the robbery. LOPEZ-VANEGAS responded that they (referring to the other individuals) had the items needed. CHAVEZ questioned the UC concerning obtaining a vehicle for the robbery. MORENO stated that they wanted a U-Haul. WIMBERLY explained the manner in which the vehicles would be utilized in the robbery. The UC ensured that all six individuals wished to execute the robbery. The UC and Jesus NORIEGA further discussed the manner in which the robbery would be conducted. WIMBERLY stated, "When you drive up, they open the door, we can walk right in, boom, I'll put a strap to your head, you know what I mean, and I'll use you as, as. . ." All discussed the manner in which the robbery would occur. Jesus NORIEGA stated they would be saying "Police" when they entered the residence. Jesus NORIEGA arranged that he and four of the individuals present would enter the house and CHAVEZ would drive the truck, which would be used to transport the stolen marijuana. The UC and CI subsequently departed the area. Later the same date, the UC contacted CHAVEZ on his cellular telephone and advised CHAVEZ that the collection would occur on Thursday, June 2, 2011, not Friday, June 3, 2011, as he had previously stated. The UC stated that on Wednesday, June 1, 2011, he would be told the area and time he would be called the following day, June 2, 2011. Later the same date, the UC discovered that he had missed a telephone call from the CHAVEZ's cellular number. The UC returned the call, and CHAVEZ asked the UC if he remembered CARILLO, who was with CHAVEZ at the April 19, 2011, meeting. CHAVEZ stated that he did not want to leave CARILLO out, due to the fact that CARILLO was one of his people. CHAVEZ stated he was going to have CARILLO drive the truck. CHAVEZ requested that he, the UC, the CI, and LOPEZ-VANEGAS each provide CARILLO with $5,000.00 to drive the truck. CHAVEZ advised that since CARILLO spoke English, he would prefer that CARILLO drive the truck. The UC requested that they speak on Wednesday, June 1, 2011, concerning this arrangement.

On June 1, 2011, the UC, CI, and ATF Special Agent Lorena Martinez traveled to Jacobs Park (Prince Road and Fairview Avenue in Tucson). Upon arriving, the UC and CI exited the undercover vehicle and were approached by CHAVEZ. CHAVEZ advised the UC that he is associates were at another park. The UC requested that CHAVEZ contact the individuals and request that they meet at their present location. The UC then walked toward a park bench and greeted LOPEZ-VANEGAS. LOPEZ-VANEGAS also stated that their associates did not wish to travel to Jacobs Park. The UC spoke to CHAVEZ concerning CARILLO. CHAVEZ stated that CARILLO would not be present this date; however he would be present the following day. The UC advised CHAVEZ that he and the CI would each provide CARILLO ten pounds (of marijuana) and that he (CHAVEZ) and LOPEZ-VANEGAS could also provide CARILLO ten pounds each. CHAVEZ confirmed that he and LOPEZ-VANEGAS would receive equal portions of half the proceeds of the robbery (marijuana). LOPEZ-VANEGAS reiterated that his associates were at a park nearby and would not travel to Jacobs Park. The UC agreed to travel to the other park. He and the CI returned to the undercover vehicle and departed the area following CHAVEZ' vehicle, a white colored pick-up truck, which followed LOPEZ-VANEGAS vehicle, a bluish colored automobile. The UC followed

the vehicles to Jacinto Park located at the intersection of 15th Avenue and Jacinto Street in Tucson. Upon arriving, the UC parked his vehicle behind LOPEZ-VANEGAS' automobile on Tipton Drive. The UC observed CHAVEZ park his vehicle in the parking lot of the park. The UC and CI exited the undercover vehicle. The UC, CI, CHAVEZ, and LOPEZ-VANEGAS approached a park bench. The UC observed Jesus NORIEGA and CASTRO sitting on the bench. The UC greeted both individuals and sat next to Jesus NORIEGA, and CHAVEZ sat to the UC's left. Across the bench sat LOPEZ-VANEGAS, CASTRO, and the CI. The UC asked CASTRO where the rest of the crew was at. CASTRO replied that they were nearby but would not be arriving. Jesus NORIEGA stated that they all did not need to be present. The UC stated they could all talk the following day concerning their plans for the robbery. Jesus NORIEGA stated he was nervous about two people sitting close by, who were unrelated to this investigation. Jesus NORIEGA advised the UC to only discuss his information and not speak about marijuana. The UC stated he was to be called the next day between the 12:45 pm and 1:00 pm and was told to wait in the area of 19th and Valencia. The UC stated that he needed to move his girlfriend the following day and would rent the truck at that time. The UC confirmed with the individuals present that they would meet at this location at 12:00 pm. CASTRO stated that they wished for the UC to enter the residence and confirm that the marijuana was present. They then would execute the robbery. The UC guaranteed that the marijuana would be in the residence. Jesus NORIEGA assured the UC that the robbery would be conducted. The UC again requested to meet with all members of the crew. Jesus NORIEGA stated they were going to speak with the rest of the crew. The UC confirmed that he and the CI would be at the park at 12:00 pm the following day. Jesus NORIEGA requested that the UC park the U-Haul truck away from the park. The UC and the CI departed the park in the company of Special Agent Martinez.

On June 2, 2011, the UC traveled to a hotel parking lot in Tucson. While at the parking lot, the UC received several telephone calls from the CI concerning members of the home invasion crew traveling from a nearby location to meet with the UC. The UC received a telephone call from CHAVEZ, and provide CHAVEZ with instructions to arrive at the UC's location. The UC then observe the CI arrive with three additional vehicles (subsequently identified as one 1984 two-tone blue Chevrolet Suburban Silverado with Arizona license plate AKR2534, one 1994 black Lexus ES300, Arizona license plate AKV4730, and one 2001 silver Audi A6, Arizona license plate APG4045). The UC approached the Lexus and asked MORENO (the driver) and WIMBERLY (the front seat passenger), "We ready, bro?" Moreno answered, "Hell yeah we're ready." The UC then approached the Chevrolet and observed an unknown male (later identified as Miguel MENDOZA) in the front passenger seat. UC advised MENDOZA that they were going to "split the pot half and half," and stated, "There's supposed to be like 1,500 pounds of weed in there, but there's two guys that are armed, okay, no one guy that is armed, two guys in the house, okay, is that cool?" MENDOZA answered, "Yeah." The UC then requested to speak with all the individuals concerning their plan for the robbery. The UC greeted the individuals and waited until all nine individuals were in close proximity to him. Jesus NORIEGA stated, "You going in, we're running in, there's four guys that are going to be in your SUV with you." Jesus NORIEGA also stated that two additional individuals would be also participating in the robbery, and explained the manner in which the robbery would be conducted. MENDOZA used his cellular telephone to call an unknown individual. WIMBERLY requested that the UC "back up" his vehicle to the residence to allow easier access for the individuals to exit. The UC explained, "When I walk in, there's a tall skinny

guy and a fat guy, the little fat guy's got the gun in his pants, okay, they open the door behind me, the little guy with the gun, he stays with me, okay, the big tall guy, he goes around to a back room, then he peels my 100 pounds of weed, gives it to me and tells me where I got to go, okay, but 1,500 pounds to 2,000 pounds is in the living room, and it's all marked up, so remember what I told you guys, you have to take that wrapping off." (During this conversation, a previously unknown male, later identified as Ricardo NORIEGA, was standing to the UC's immediate left.) Jesus NORIEGA continued to discuss the manner in which the robbery would be executed. The UC advised the individuals that the U-Haul truck was located at a nearby unit, and questioned WIMBERLY if they wished to utilize a storage unit he (the UC) had. WIMBERLY responded "I got a place already." Jesus NORIEGA advised the UC, "Don't be nervous, act normal," and further advised that the UC needed to act normal otherwise the alleged occupants would detect something was happening. WIMBERLY stated he was the person that would control the UC in the residence during the robbery. Jesus NORIEGA stated that CARILLO would be with Ricardo NORIEGA during the robbery. (Both CARILLO and Ricardo NORIEGA were in close proximity to Jesus NORIEGA when he made this statement.) MENDOZA continued to call the two remaining individuals using his cellular telephone. CASTRO reminded the UC to park his vehicle in such a manner as to allow easy access for the individuals in his vehicle to exit. The UC engaged in conversation with CARILLO and WIMBERLY concerning the entry point for the robbery. Jesus NORIEGA stated that they needed to leave the area due to people looking at them. MENDOZA stated the two additional individuals were en route. All the individuals entered their respective vehicles. The UC and CI entered the undercover vehicle. All vehicles departed the hotel parking area. The Audi, containing CHAVEZ, CARILLO and LOPEZ-VANEGAS, followed the undercover vehicle to a nearby storage unit to obtain a truck. While driving to the storage unit, the UC observed the Lexus and the Chevrolet turn left as he and the Audi automobile turned right. All nine individuals were then arrested. Prior to arrest, Jesus NORIEGA attempted to flee law enforcement officers, who were able to apprehend him after a lengthy foot chase. Along Jesus NORIEGA's path, a loaded Sig Sauer 9mm Luger pistol was found. In the Chevrolet, in plain view on the front seat was a set of gloves, a ski mask, and a magazine loaded with .45 caliber ammunition. In the back seat of the Chevrolet, also in plain view, were a long sleeve black T-shirt, at least two additional sets of gloves, a black knit cap, and a holster for a pistol.